IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  11-cv-03333-WYD-KLM

THE ROBERT W. THOMAS AND ANNE MCDONALD THOMAS REVOCABLE
TRUST, Trust Domiciled in the State of Washington,

      Plaintiff,

v.

INLAND PACIFIC COLORADO, LLC, a Nevada limited liability company;
FIRST WESTERN TRUST BANK, a Colorado company,
WESTMINSTER PROMENADE DEVELOPMENT COMPANY II, LLC, a
Nevada limited liability company, and TIMOTHY and MEGAN O'BYRNE, husband and
wife and residents of Colorado, and their marital community.

      Defendants.

---

## ORDER

---

I.    <u>INTRODUCTION</u>

      THIS MATTER is before the Court on the Thomas Trust's Motion for Summary

Judgment Reforming Deed of Trust and Ordering Payment of Promissory Note filed on

January 11, 2012.  On February 9, 2012, Defendants Inland Pacific Colorado, LLC

["IPC"] and Westminster Promenade Development Company II, LLC ["WPDC"]

collectively filed a response, and First Western Trust Bank filed a separate response.[1]

Replies were filed by the Trust on February 24 and February 27, 2012.

---

[1]  Plaintiff The Robert W. Thomas and Anne McDonald Thomas Revocable Trust shall be referred
to herein as "the Trust".  IPC and WPDC may collectively be referred to herein as "Defendants."
Defendant First Western Trust Bank will separately be referred to as "First Western".  I note that since the
filing of the summary judgment motion, an Amended Complaint was filed adding additional defendants,
including Timothy O'Byrne ["O'Byrne"] who is referenced in this Order.  The Trust advised the Court by
Statement filed April 9, 2012, that the Amended Complaint does not impact the summary judgment
motion.

The Trust moves for summary judgment ordering that 1) IPC is in default of its obligations under a $1 million promissory note with accrued interest and attorney fees [the "Note"]; and 2) judgment be entered against IPC in the amount of all sums due under the Note, including the full principal sum, interest, and default interest accrued since the date the Note was due, plus attorney fees and related collection costs. The Trust also seeks entry of judgment against IPC, WPDC and First Western requiring reformation *ab initio* of the deed of trust provided by IPC for the purpose of securing its obligations under the Note. This motion is actually a motion for partial summary judgment, as it does not ask for judgment on all the claims. For the reasons discussed below, the Trust's motion is granted in part and denied in part. I also deny for the record Plaintiff's Motion to Refer Pending Dispositive Motions to United States Magistrate Judge Kristen L. Mix for Report and Recommendation filed April 4, 2012.

II.   FACTUAL BACKGROUND

A.   The Trust's Statement of Facts[2]

Plaintiff is a trust domiciled in the State of Washington with Robert W. Thomas and Anne McDonald Thomas [the "Thomases"] as the trustees. IPC and WPDC are limited liability companies.[3] WPDC is owned by IPC, its sole member. On May 16,

---

[2] I have cited to the record only where the facts are disputed or when I felt it was necessary.

[3] The Trust asserts that IPC and WPDC are controlled by O'Byrne or that he has *de facto* control, stating that O'Byrne represented to the Trust that he has legal authority to act on behalf of both entities. (Ann McDonald Thomas Decl. ["Thomas Decl."] ¶ 3, attached to Pl.'s Mot. Summ. J.)  IPC and WPDC deny that they are controlled by O'Byrne, arguing that they follow all statutes regarding limited liability company structure and management and that O'Byrne has no more say or control in IPC or WPDC than any other manager.  (O'Bryne Decl. ¶¶ 3-4, Ex. A to Defs.' IPC and WPDC's Resp. to Pl.'s Mot. Summ. J. ["Defs.' Resp."].)

2008, following negotiations with O'Byrne for the sale of the Trust's interest in property in Westminster, Colorado [the "Property"], the Trust entered into the Agreement of Purchase and Sale with IPC for sale of the Property to IPC or its designee for $2,106,321. (Thomas Decl. ¶ 4 and Ex. 1, as corrected in the Notice of Filing Errata and Correction Concerning the Thomas Trust's Mot. for Summ. J. ["Errata"].)[4]

IPC agreed to pay the Trust partly in cash and partly via the Note which was delivered on May 15, 2008. O'Byrne executed the Note on behalf of IPC as its President/Manager. The Note stated, "The indebtedness evidenced by the Note is secured by a Deed of Trust dated May 6, 2008. . . ." (Thomas Decl. Ex. 2, as corrected in the Errata.)[5] A Deed of Trust ["DOT"] was executed by the parties. (*Id.* Ex. 3.) While the DOT states that it "is made this 6th day of May, 2008", it was actually signed by O'Byrne on behalf of IPC on June 5, 2008. (*Id.*) Indeed, while the Trust asserted in its motion that the "closing" took place on May 15, 2008, it later admitted in its reply that the Note and DOT were each negotiated and executed in June 2008.

In the Note, IPC agreed to pay the Trust "the principle sum of ONE MILLION DOLLARS ($1,000,000.00); with interest thereon at six percent (6 %), simple interest, per annum, compounded annually." (Thomas Decl. Ex. 2.) The Note also provides that

---

[4] The Property was originally acquired by Doug Wetter ["Wetter"] in 2005 for $3,740,000. Defendants note that following Wetter's purchase of the Property, he contacted the Thomases to see if the Trust had any interest in investing in the Property. The Thomases, through the Trust, agreed to invest in the Property and the arrangement created a situation whereby Wetter owned 50% of the Property and the Trust owned the remaining 50% of the Property. On June 5, 2008, Defendants purchased Wetter's 50% interest in the Property for $1,831,930.00.

[5] Hereafter, when I reference the exhibits to Thomas' Declaration, I will be referring to the corrected exhibits in the Errata.

"[t]he entire amount, with interest, and any charges due pursuant to the [DOT], are due in twenty-four (24) months ("Due Date"). . . .If not sooner paid, the entire principal amount outstanding and accrued interest thereon shall be due and payable on May 14, 2010." (*Id.*)  "If any payment required by this Notice is not paid when due, or if any default under the [DOT] securing this Notice occurs, the entire principal amount outstanding and accrued interest thereon shall at once become due and payable at the option of the Note Holder and the indebtedness shall bear interest a [sic] the rate of 12 percent per annum from the date of default." (*Id*).  Expenses and attorneys' fees were also required to be paid if applicable.  (*Id.*)

On May 14, 2010, the Trust asserts that IPC failed to pay its Note obligations. (Thomas Decl. ¶ 7.)  Defendants deny that a default occurred, as it asserts there were multiple oral and written agreements that altered the terms of the Note.  This allegedly included oral agreements with the Trust whereby the Trust and Defendants agreed that no payment would be due until development of the Property or a value creation event occurred, and is discussed in more detail in Section III.B.1, *infra*.  As no development or a value creation event occurred, Defendants assert that no payment was due and there was no default under the terms of the Note.  (O'Byrne Decl. ¶¶11-13, 19-22, 24, 26-28.) The Trust denies that the asserted oral agreements were ever made, and/or asserts that any oral agreements contradict and vary the terms of unambiguous agreements and emails.

IPC made a partial interest payment of $120,000 on or about May 19, 2010, but this payment was less than the total interest due under the Note, excluding default

interest, which the Trust asserts had already begun to accrue before the partial interest payment. (Thomas Decl. ¶ 7.) Defendants admit making the interest payment, but deny that a default had occurred on the Note. Thus, they assert that default interest had not yet begun to accrue. (O'Byrne Decl. ¶ 25.) It is undisputed that no payment has been made since the $120,000 partial interest payment.

The Trust asserts that after defaulting on the Note, O'Byrne acknowledged his obligation to pay the Trust in an email dated May 16, 2010. (Thomas Decl. Ex. 4.) The email from O'Byrne to Ann McDonald Thomas stated, "Getting you paid is a top priority for us as I understand your current financial needs. We don't want to be an undue cause of stress for you and we want to get you paid as quickly as possible, which we will do." (Id.)[6] On many occasions the Trust, through counsel, has notified IPC of its continuing default and has demanded payment. Between the spring of 2010 and early 2011, the Trust and O'Byrne (mainly through counsel) also discussed potential payment arrangements, but no payments have been made.

The Trust asserts that as of January 11, 2012, the Note obligation is $1,000,000 in principal, $3,600 in original interest at 6%, and $209,103 in accrued default interest, exclusive of attorney's fees and other costs. (Thomas Decl. ¶ 9 and Ex. 5.) This is denied by Defendants, as they deny that default has occurred and dispute the amount of interest due under the Note as well as the calculation. (O'Byrne Decl. ¶¶ 14, 28.)

---

[6] Defendants deny that O'Byrne acknowledged any obligation to pay the Trust in the email. Rather, they assert that O'Byrne was stating the Trust would be paid as soon as the conditions precedent required by the subsequent oral and written agreements were satisfied. (O'Byrne Decl. ¶ 26.)

Under the terms of the Agreement of Purchase and Sale between IPC and the Trust, the Trust was obligated to transfer the Property to IPC "or Buyer's 1031 exchange assignee" and to cooperate in executing such additional documents (not specifically identified) as might be necessary to facilitate a tax-free exchange, pursuant to Section 1031 of the United States Internal Revenue Code (26 U.S.C. §1031) [the "1031 Exchange"].[7]  IPC entered into an Assignment Agreement transferring all its "rights, but not its obligations" in the Property to an intermediary, First American Exchange Company, LLC.

The Trust signed the Assignment Agreement as required, as did the intermediary and IPC, on May 29 and June 4, 2008.  (Thomas Decl. Ex. 7.)  The intermediary agreed that a separate entity—WPDC—would take title to the Property.  Defendants assert that the Assignment Agreement reflects the part-oral, part-written nature of the agreement between the parties; the Trust denies the existence of any oral agreement.[8]

Pursuant to its agreement to transfer the Property to Buyer's assignee, the Trust deeded the Property to WPDC on June 4, 2008.  The Trust asserts that this was done at the instruction or request of O'Byrne.  (Thomas Decl. ¶ 8.)  The total consideration paid was $2,016,321.73, which included the "Note to Thomas Trust."

One day after the closing papers were signed, on June 5, 2008, O'Byrne executed the DOT on behalf of IPC, purporting to grant rights in the Property as the

---

[7]  While Defendants assert in their response that the Agreement of Purchase and Sale was not between IPC and the Trust, the Agreement does not support this as it was signed by those parties.

[8]  Defendants also point out that the Assignment Agreement refers to IPC as the buyer and the Thomas Trust, DS Wetter, LLC and RM Wetter, LLC as sellers.

Trust's security for the Note.  The Trust asserts that this execution of the DOT by IPC was not in accordance with the parties' agreement, which was that there would be an effective transfer via the DOT's execution by the owner of the Property, which had become WPDC.  (Thomas Decl. Exs. 1-3.)  The DOT itself states that "Borrower covenants that Borrower owns and has the right to grant and convey the Property, and warrants title to same…" (*Id.* Ex. 3 ¶ 3.)  The Trust asserts that WPDC held title to the Property when the DOT was signed only because the Trust was obligated to, and therefore did, transfer title to the designated entity—WPDC—as provided in the Agreement.  (*Id.*, Ex. 1 at ¶ 5.1.1.)  In executing the DOT, the Trust maintains that IPC purported to grant rights in the Property to the Trust as security for the Note, as required by the parties' agreements, but WPDC had acquired title in the meantime.

In response to the facts in the previous paragraph, Defendants assert that IPC had nothing to convey at the time the DOT was entered into as it did not own any interest in the Property.  (O'Byrne Decl. ¶ 16.)  They also assert that the Trust was aware that IPC had nothing to convey at the time the DOT was entered into, especially given that the Thomases as trustees of the Trust are sophisticated attorneys.  (*Id.* ¶¶ 5, 16.)  The Trust denies that it knew at the time the DOT was issued that it had been executed by an entity that did not own the property.  The Trust asserts that it discovered the error during the course of reviewing the documentation following the default, and informed O'Byrne and his counsel of it in February 2011.

In response, on February 22, 2011, O'Byrne's counsel wrote that "if there is an error in the deed of trust that does not give the Trust the intended security for the

promissory note, my client will correct the error."  (Elizabeth Perka Decl. ["Perka Decl."],
Ex. 3, attached to Pl.'s Mot.)

The Trust then stated that unless reformation occurred, it would initiate a
reformation action.  On June 10, 2011, the Trust sent O'Byrne's counsel a draft
(reformed) deed of trust.  (Perka Decl. Ex. 4.)  The Trust asserts that O'Byrne and his
counsel failed to respond in any meaningful way (*id.* Ex. 5), which Defendants deny.
Defendants contend that the reformed deed of trust suggested by the Trust was
objectionable because it purported to relate back to an effective date that conflicted with
the seniority of the First Western Deed of Trust and would render the DOT at issue
ineffective and fraudulent.  Defendants suggested a short form deed of trust that would
reform the name of the grantor.  (O'Byrne Decl. ¶ 17).

The Trust admits that Defendants proposed a short form of a corrective DOT.  It
sought to adapt to this approach, but asserts that Defendants refused to produce a
corrective DOT in proper form—one that effected reformation *ab initio* in order to
accomplish the intent of the parties.  The most recent version of the corrected DOT
offered by IPC's counsel made the correction effective currently (proposing that WPDC
"hereby grants" security in the Property), not *ab initio* (and was not proposed until after
this action was filed).  (Perka Decl. Ex. 12.)

On November 10, 2011, the Trust wrote to O'Byrne's counsel, attaching a draft
Complaint—and advised that if it did not receive executed documents appropriately
reforming the DOT within seven days, it would file the Complaint in this Court.

Six days later, on November 16, 2001, counsel for O'Byrne sent the Trust a draft "Correction Addendum," stating that O'Byrne would be "available to sign a final document on Monday of next week". (Perka Decl. Ex. 9.) The Trust asserts that this document departed substantially from the documentation that had been sent by the Trust in June 2011, and (among other problems) changed the definition of "Borrower" when the change required related to the identity of the Grantor of the DOT. (Perka Decl. Ex. 7.)[9] On November 30, 2011, the Trust sent specific changes to O'Byrne's draft "Correction Addendum". (*Id.* Ex. 8.) It states it used the format counsel for O'Byrne apparently preferred but corrected its deficiencies, which Defendants deny. Defendants refused to execute the suggested addendum which would make the reformation of the DOT effective at the time of the original transaction. as they contend that it would affect the lien priority of First Western's trust deed—the first lien on the Property. (O'Byrne Decl. ¶ 17.)

The Trust requested executed reformation documents within a few days. O'Byrne's counsel responded on December 8, 2011, that he would "target early next week to. . . finaliz[e] the Correction Addendum." (Perka Decl. Ex. 9.) On December 13, 2011, the Trust again wrote to O'Byrne's counsel, stating that "[i]f we do not have a signed reformation document by noon on Friday of this week [December 16, 2011], we

---

[9] Defendants assert in response that the Trust initially stated that changing the definition of "Borrower" was not required, then later acquiesced and stated that such a change was appropriate. The Trust denies this, stating that in the original DOT, the term "Borrower" was used interchangeably to refer to the Grantor and Borrower. As a result, the Trust asserts that the change in "Borrower" would have led to absurd results. Defendants also assert that when the Trust's counsel did not respond to their proposed correction addendum, they executed the addendum and forwarded it to the Trust's counsel on November 23, 2011.

will file the action that afternoon." (*Id.* Ex. 10.)  The following day, counsel for O'Byrne

responded, "I respectfully disagree with your unilateral deadline of this week Friday

morning, which I find unreasonable.  Please be aware that existing commitments will not

allow me to accommodate your desired schedule." (*Id.* Ex. 11.)

The Trust waited until December 20, 2011, to file this action.  As of that date, the

Trust asserts it had received no proposed revision to the DOT that reflected the parties'

intent, much less an executed document to that effect, nor was there any explanation

why arriving at a final document would require more than a few minutes of further effort,

if any.  (Perka Decl. ¶ 14.)  Again, Defendants assert that they refused to execute a

deed of trust that did not maintain First Western's lien priority.

Despite the fact that the Trust informed O'Byrne that it would file a collection and

foreclosure action if payment was not made, there was no suggestion of a payment of

any kind as of the date this action was filed.  (Perka Decl. Ex. 1; Thomas Decl. ¶ 7.)

Again, Defendants deny that a payment is currently due on the Note.

After this Complaint was filed, counsel for IPC/O'Byrne proposed yet another

version of "reformation" in which WPDC "hereby grants" (in the present) security in the

Property.  The Trust asserts that this proposal did not address the Trust's request for,

and entitlement to, reformation to conform the DOT to the parties' original intent—*i.e.*, a

reformation document that was effective as of the date of the original transaction in May

2008, as requested in this action and as the Trust had requested over a period of ten

months before the action was filed.  (Perka Decl. Ex. 12.)  Defendants deny this,

asserting that it is unclear what the "date of the original transaction" is—the DOT is

dated May 6, 2008, the date of the Note is May 15, 2008, the date of the Agreement of

Purchase and Sale was May 16, 2008, and the escrow closing date was June 4, 2008.

Further, Defendants assert that the Trust has refused to recognize that First Western's

deed of trust is senior to the Trust's Deed of Trust and that it was always the parties'

intent to maintain that seniority.  (O'Byrne Decl. ¶ 17.)[10]

> B.  Defendants IPC and WPDC's Additional Facts

Defendants state that the initial thought with respect to the Property was that

Wetter and the Trust would build a condominium project on the Property.  The Trust

does not deny this, admitting that the parties discussed potential development of the

Property that the Trust and the Wetters owned as tenants in common.  Economic

conditions precluded further development on the condominium project.  After the

condominium project failed, Defendants assert that the Trust and Wetter were unable to

develop the Property from 2005 to 2008.  (O'Byrne Decl. ¶ 9.)  While the Trust denies it

was "unable" to develop the Property, it admits that no development took place.

Defendants assert that after they were introduced to the Trust, the Trust

approached Defendants and asked them to help the Trust recoup their initial investment

in the Property.  Defendants state that they agreed to carry the Trust's costs until the

Property could be developed or a value creation event occurred (i.e. sale at a premium,

---

[10] In reply, while the Trust admits the closing date of June 4, 2008, it denies the remainder of Defendants' assertions.  It maintains that none of the parties' written agreements contain any provision regarding "maintain[ing] that security", and that the Bank's priority is a function of its recorded lien vs. a DOT (whether reformed or not) that as of this date is still unrecorded.  The Trust is unaware whether later advances occurred or are contemplated that may not enjoy relation back.  The Trust also asserts that it lacks sufficient information to take a position on the Bank's priority with respect to advances that may or may not have been made since the Bank recorded its interest.  It understands that the Bank recorded its lien in 2008 or earlier, and the Trust has not recorded any version of the DOT.

development, package sale with another property, etc.) (O'Byrne Decl. ¶ 11), which is denied by the Trust.  In connection with that alleged agreement, Defendants assert that they paid the Trust $1,016,321.73 in cash and executed a $1,000,000 promissory note. Defendants covered all of the Trust's carrying costs related to the purchase, totaling nearly $200,000.  They did not cover the carrying costs for Wetter.[11]  Following these negotiations, Defendants contend that the parties entered into an oral agreement (O'Byrne Decl. ¶ 13), which the Trust denies.

According to Defendants, the parties' oral agreement contained the following rights and obligations:  a) the two-year payment provision in the Note was a soft payment date and would not become due until the property was actually developed or a value creation event occurred; b) the Note's payment term would be extended until development on the Property was complete or a value creation event occurred; c) the Trust would refrain from recording the DOT; d) Defendants were responsible for developing the Property and would pay back the Trust upon development (which would include a premium if the development was successful) or a value creation event occurred; and e) IPC agreed to pay a premium (i.e. carry the Trust's closing costs) for the Property in exchange for this oral agreement/arrangement.  (O'Byrne Decl. ¶ 19.) The Trust denies this, asserting that there was no such oral agreement and that the claim contradicts the unambiguous material terms of the written agreements.

---

[11]  In response to this , the Trust admits only that, pursuant to the terms of the Agreement Regarding Purchase and Sale, Defendants agreed to pay the Trust $2,106,321 for sale of the Trust's interest in the Property, which included $1,016,321.71 in cash and a $1,000,000 Promissory Note. (Thomas Decl. Ex. 1.)

As to the Note, O'Byrne believes that the Note was subject to 6% simple interest, and states that is what Defendants intended.  (O'Byrne Decl. ¶ 14.)  The Trust denies that O'Byrne actually "believes" that the Note did not call for compound interest, asserting that this "belief" is contradicted by the plain terms of the Note which states interest was to be "compounded annually."  (Thomas Decl. Ex. 2.)

After the execution of the Note and DOT, Defendants contend that the parties ratified and performed the prior oral agreement regarding the Note and Deed of Trust. As alleged evidence of the parties' oral agreement, the DOT has never been recorded and the Trust refrained from filing a lawsuit on the Note or DOT until December 2011. The Trust denies that these facts are evidence of the parties' oral agreement.  It also states that after Defendants defaulted on the Note in 2008, it acquired information suggesting that the Bank's lien exceeded the value of the Property.  The Trust realized that the DOT had not been executed by the owner of the Property, and was concerned that a slander of title claim might be made if the DOT were recorded before it was reformed.  The Trust took steps to accomplish reformation and finally filed an action after ten months of unfulfilled assurances that reformation would be accomplished voluntarily.

The Trust and Defendants entered into two written agreements in 2010. Defendants assert that these two agreements evidence the oral agreement, which the Trust denies.  The first agreement dated October 4, 2010, was entitled "Agreement Regarding Disposition of Property" [the "Forbearance Agreement"].  (Def.'s Resp., Ex. D.)  The second was a Performance Guarantee Agreement signed by O'Byrne on

October 4, 2010 (*Id.*, Ex. F.), which was contemplated in the Forbearance Agreement.

It related only to IPC's performance of an obligation to give the Trust notice of any

impending sale.

The Forbearance Agreement recognized that the DOT was not yet recorded, and

indicated that O'Byrne advised the Trust that "negotiations are in process for a potential

sale of a portion of the Property" and that "he wishes to avoid the recording of the DOT

during those negotiations."  (Defs.' Resp., Ex. D)  It also provided in pertinent part:

> 1.  [IPC] and WPDC agree that no sale, disposition, encumbrance or
> transfer . . . of the Property will occur without [IPC] and WPDC's providing
> at least seven (7) business days' notice to the Thomas Trust . . . in order
> to permit the . . .Trust to take action to protect its interest in the Property. . . .
>
> 2. As detailed in a separate "Performance Guarantee Agreement" . . . O'Byrne
> personally guarantees the performance by [IPC] and WPDC of the promise set
> forth in the preceding paragraph . . . .
>
> 3. The . . . Trust agrees that, while the current transaction is pending, but only as
> long as the. . .Trust determines in its sole discretion that the potential transaction
> has a realistic prospect of closing on terms that produce a substantial payment
> against the note obligation, the . . .Trust will refrain from recording the DOT. . . .
>
> 4. This forbearance will also depend on the. . .Trust's receiving regular updates
> regarding developments in the negotiations for the sale of the Property, . . . .
>
> 5. It is further agreed that this Agreement and . . . forbearance as called for
> herein are subject to a full reservation of all rights of the. . .Trust under the Note
> and DOT and otherwise, including all remedies for any past or future breach of
> any obligations under the Note and DOT.

(*Id.*)  Defendants assert that they materially performed all their obligations under the

Forbearance Agreement.  (O'Byrne Decl. ¶¶ 20, 21, 22.)  The Trust asserts that the two

agreements speak for themselves and do not contain any provision affecting the Trust's

right to collect the Note except to expressly preserve it.

Defendants maintain that the Forbearance Agreement was suggested by the Trust.  It points out that the Trust's counsel wrote a letter on September 13, 2010, stating "[i]n order for the Trust to refrain from filing a lawsuit and recording its Deed of Trust, the Thomas Trust requires a personal, written guarantee from Mr. O'Byrne ... " (Defs.' Resp., Ex. E.)  The Trust denies that the Agreement was suggested by its counsel, pointing out that the Forbearance Agreement provides, "Timothy O'Byrne . . . wishes to avoid the recording of the DOT during those negotiations."  (*Id.*, Ex. D.)

Finally, Defendants assert that the economy has precluded them from developing the Property or a value creation event from occurring.  Thus, when the original term of the Note became due on or about May 15, 2010, they attempted to negotiate an extension of the payment term.  According to Defendants, the Trust refused to negotiate an extension of the payment term in derogation of the parties' agreement.  (O'Byrne Decl. ¶¶ 23, 24.)  The Trust admits that it declined to extend the May 14, 2010 due date for the Note, and denies Defendants' remaining assertions in this paragraph, including the existence of an oral agreement.

C.    First Western's Additional Facts

When the Note was delivered by IPC to the Trust on May 15, 1008, it was apparently unsecured.[12]  On June 4, 2008, WPDC executed a promissory note in favor of First Western in the original principal amount of $2,885,000.00 (the "First Western Note", as amended).  (Decl. of Susan Rice ["Rice Decl."] ¶ 2, attached to First Western's

---

[12]  While the Trust does not deny this, it asserts that the IPC Note was intended to be secured by the later executed DOT in favor of the Trust which is why the Trust now seeks reformation of the DOT.

Resp.)  The First Western Note is secured by a Deed of Trust dated June 4, 2008, executed by WPDC ("First Western DOT"), and recorded in the real estate records of Jefferson County, Colorado, on June 6, 2008 at Reception No. 2008055880, encumbering the Property.  (Rice Decl. ¶ 3.)[13]  First Western has never agreed that the IPC Deed of Trust, or any other lien, would have a superior lien position against the Property relative to the First Western Deed of Trust.  (*Id.* ¶ 4.)  First Western was named in this lawsuit only because of its secured interest in the Property.

On June 5, 2008 (one day after the closing of the First Western loan), IPC executed the Deed of Trust purporting to encumber the Property as security for the IPC Note even though the Property was actually owned by WPDC.  The Trust admits that it did not record the IPC Deed of Trust in the real estate records.

III.   ANALYSIS

A.   Standard of Review

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit."  *E.E.O.C. v. Horizon/ CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  "A dispute over

___

[13]  A true and accurate copy of the Note, including the amendments thereto, is attached to the Declaration of Susan Rice as Exhibit A.  A true and accurate copy of the First Western DOT is attached to the Declaration as Exhibit B.

-16-

a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.*

The burden of showing that no genuine issue of material fact exists is borne by the moving party. *Horizon/ CMS Healthcare Corp.*, 220 F.3d at 1190. "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted). When applying the summary judgment standard, the court must "'view the evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.'" *Id.* (quotation omitted). All doubts must be resolved in favor of the existence of triable issues of fact. *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

B.     Whether Summary Judgment is Appropriate

Before addressing the merits of the motion, I note that IPC and WPDC asserted in their response that the Court should delay ruling on this motion due to the pendency of motions to dismiss that argued the Court lacks jurisdiction over the case pursuant to 28 U.S.C. § 1332. I reject this argument. While Defendants' motion to dismiss filed in February 2012 did raise a jurisdictional issue, the issue was later rendered moot, and ultimately denied as moot by the Court, due to the filing of the Amended Complaint. (Order of June 14, 2012, ECF No. 63.) There is thus no reason to delay a ruling on the summary judgment motion. Accordingly, I turn to its merits.

1.     <u>Whether The Note Should Be Enforced</u>

The Trust seeks summary judgment in its favor on the IPC Note, asserting that IPC is in default of its obligations under the Note and owes $1,212,703 as of January 6, 2012, plus additional default interest until paid and attorney fees and costs.  Defendants assert that the motion should be denied on this issue.

I note that Article 3 of Colorado's Uniform Commercial Code (the "Code") governs negotiable instruments.  *See* Colo. Rev. Stat. § 4-3-102.  A "negotiable instrument" is defined generally as "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order" which "[i]s payable on demand or at definite time."  *Id.* § 4-3-104(a)(2).  Such instrument is a "note", *id.*, and the Code requires the issuer (the maker) of a note to pay it according to the terms when issued to a person entitled to enforce it.  *Id.* § 4-3-412.  The holder of the note is entitled to enforce it.  *Id.* § 4-3-301.  Where the promisor defaults on a note, the holder may bring an action to obtain a judgment against the defaulting party.  *See Mortg. Inv. Corp. v. Battle Mountain Corp.,* 70 P.3d 1176, 1184-85 (Colo. 2003).

In this case, Defendants argue that summary judgment should be denied on the Note because the parties entered into oral agreements that modified the Note's terms, and that they are not in default under the Note based on the terms of those oral agreements.  They argue that summary judgment must be denied because the existence of the oral agreement and its terms must be determined by the jury.

More specifically, Defendants contend that the terms of the oral agreement specifically provided that the two-year payment term would not become due until the Property was actually developed or a value creation event occurred, that the payment term would be extended until development was complete or such an event occurred, and that they were not required to repay the Trust until development or a value creation event occurred, citing to O'Byrne's Declaration.  Defendants assert that these representations were made prior to execution of the Note.  Since no development or value creation had occurred at the Property as of May 14, 2010, Defendants contend that no default occurred.

I reject this argument as a basis to deny summary judgment.  First, I agree with the Trust that this alleged oral agreement entered into prior to the Note contradicts the Note and Agreement of Purchase and Sale which provide that payments on the Note "shall be deferred for a period of two years (24 months) from the date of Closing, when the entire balance of principal and interest shall be due and owing."  (Thomas Decl. Exs. 1 and 2.)  The Note provides that it is due May 14, 2010.  Further, the Agreement of Purchase and Sale which requires that the Buyer deliver the Note to the Sellers before closing states, "This agreement constitutes the entire agreement between Sellers and Buyer with respect to the purchase and sale of the Property and supersedes all prior agreements, understandings, offers, and negotiations, oral or written, with respect to the Property."  (*Id*. Ex. 1 ¶ 6.1.)

I also note that shortly after the Note balance was due, on May 18, 2012, O'Byrne wrote to Anne McDonald Thomas stating, "Anne - we will be wiring all

accumulated interest tomorrow and at least $25k per month *plus interest*, or accelerated

from other sources, until paid in full." I agree with the Trust that this assurance is

inconsistent with Defendants' contention that the Note was not due on May 14, 2010 (or

even now) per the parties' oral agreement. Instead, on May 18, 2010, O'Byrne was

promising to pay all interest plus $25,000 per month in principal. If O'Byrne had

believed that the Note was not yet due, this promise to begin paying $300,000 a year in

principal is nonsensical. Instead, it appears that O'Byrne made that promise in hopes of

getting an extension of the loan. O'Byrne also made a partial interest payment on May

19, 2012, which again appears inconsistent with Defendants' contention that no default

had occurred on the Note.

Defendants also argue, however, that the parties ratified and performed their

prior oral agreement following execution of the Note, and that the parties' conduct is

inconsistent with the notion that the written documents are the entire agreement

between the parties. In that regard, it is argued that Defendants agreed to pay a

premium price for the Property over that paid to Wetter to cover the Thomases' carrying

costs and to "make them whole" on the transaction. Defendants also point to the fact

that while the Note was delivered on May 15, 2008, the DOT was not executed until

June 5, 2008 and was not ever recorded. Further, they point to the fact that while the

alleged breach of the Note took place in May 2010, this lawsuit was not filed until

December 2011. Defendants argue that these facts show the parties agreed that the

maturity date on the Note would be extended until development or a value creation

event could occur. I reject this argument, as none of the facts referenced by

Defendants in any way support the existence of, or ratification of, an alleged oral

argument regarding the Note.

I also find that the existence of any oral agreement is barred.  As a preliminary

matter, "under law of merger, prior agreements, covenants, and conversations are

merged into the final, formal, written contracts executed by the parties." *Batterman v.*

*Wells Fargo Ag Credit Corp.*, 802 P.2d 1112, 1115 (Colo. App. 1990).  Further, "[a]bsent

allegations of fraud, accident, or mistake in the formation of a contract, parole evidence

is inadmissible to vary, contradict, change, or modify an unambiguous integrated

contract." *Tripp v. Cotter Corp.*, 701 P.2d 124, 126 (Colo. App. 1985).  Here, the Note is

clear and unambiguous regarding the obligation to pay.  Since the evidence proffered

by Defendants directly contradicts and varies the term of the agreement, it is barred

from consideration.  *See Batterman*, 802 P.2d at 1116.

It is also argued by Defendants that summary judgment must be denied on the

Note because its terms were modified by a subsequent accord and satisfaction,

referencing the Forbearance Agreement entered into between the parties on or about

October 4, 2010.  It is true that parties to a contract may agree to modify the contract

through an "accord." *Bakehouse* & *Associates, Inc.* v. *Wilkins,* 689 P.2d 1166, 1168

(Colo. App. 1984).  Such "[a]n agreement to modify an existing contract, i.e., an

executory accord, does not extinguish the original obligation, but suspends performance

of that obligation until the accord is breached or satisfied." *Id.*  If the accord is then

satisfied, the original obligation is discharged under the doctrine of accord and

satisfaction.  *Id.*  "In determining whether a debt has been discharged by an accord and

satisfaction, it first must be determined whether there was sufficient evidence to show an intent to accept the accord agreement." *Rasheed v. Mubarak*, 695 P.2d 754, 757 (Colo. App. 1984).

I find that Defendants have not presented sufficient evidence of an accord agreement to delay payment of the Note.   While Defendants assert that the Forbearance Agreement modified the Note by providing that the Trust agreed not to pursue the alleged default under the Note as long as Defendants provided regular updates regarding the pending sale of the Property, that is not supported by the Agreement.   The Agreement does not contain any reference to the Trust agreeing to delay payment of the Note.   (Defs.' Resp., Ex. D.)   Instead, the Trust agreed only to refrain from recording the DOC "while the current transaction is pending" and subject to the Trust's discretion.   *Id.*   Indeed, the Forbearance Agreement actually reinforced the Trust's right to collect the overdue Note, as it stated that "this Agreement and the . . . Trust's forbearance as called for herein are subject to a full reservation of all rights of the. . .Trust under the Note and DOT and otherwise, including all remedies for any past or future breach of any obligations under the Note and DOT.   (*Id.*)[14]   Accordingly, I reject the argument that the Note was modified by an accord and satisfaction.

---

[14]   Defendants also point to the fact that the Trust's counsel wrote in an email dated September 13, 2010, that the Trust was trying "to determine whether this potential sale [of the Property[ provides a basis for delaying an action to enforce the note obligation" as well as the recording of the DOT, and that it needed "a personal, written guarantee" from O'Byrne "[i]n order for the [Trust] to refrain from filing a lawsuit and recording its Deed of Trust."  (Defs.' Resp., Ex. E.)  However, this was written before execution of the Forbearance Agreement, and the Agreement itself did not state that the Trust would delay an action to enforce the note obligation or refrain from filing a lawsuit.  (*Id.* Ex. D.)

Defendants also have asserted in a counterclaim that the Trust fraudulently induced them into entering into the Note, which they argue is a factual determination precluding entry of summary judgment at this time.  Defendants allege in that regard that they have raised a genuine issue of material fact as to whether the Trust represented to IPC that the maturity date on the Note would be extended until development occurred or a value creation event took place at the Property prior to execution of the Note.  They further assert that O'Byrne's Declaration establishes that this oral representation was made to him prior to execution of the Note.  (O'Byrne Decl. ¶¶ 11, 12, 13.)[15]  Defendants conclude that if they are able to prove this claim, then the Note could be rescinded and no default would have occurred.  Thus, they contend that the Court should deny Plaintiff s Motion on this basis.

Turning to my analysis, the elements of a fraud in the inducement claim are:

> (1) A false representation of a material existing fact, or a representation as to a material existing fact made with a reckless disregard of its truth or falsity; or a concealment of a material existing fact, that in equity and good conscience should be disclosed; (2) knowledge on the part of the one making the representation that it is false; or utter indifference to its truth or falsity; or knowledge that he is concealing a material fact that in equity and good conscience he should disclose; (3) ignorance on the part of the one to whom representations are made or from whom such fact is concealed, of the falsity of the representation or of the existence of the fact concealed; (4) the representation or

---

[15]  O'Byrne's affidavit also makes clear, according to Defendants, that IPC would not have entered into the Note unless the Trust promised to extend the payment/maturity date until development could be completed or a value creation event occurred on the Property.  (*Id.* ¶ 12).  O'Byrne also states that IPC relied on these representations to obtain IPC's initial loan with First Western, in assisting the Trust in getting out of their loan with Guaranty Bank, in attempting to develop and/or find a buyer for the Property, in attempting to negotiate the terms of a current refinancing with First Western, and in its own affirmative representations to individuals/entities that were interested in purchasing or developing the Property.  (*Id.*)

concealment is made or practiced with the intention that it shall be acted upon; and (5) action on the representation or concealment resulting in damage.

*Trimble v. City & County of Denver,* 697 P.2d 716, 724 (Colo.1985).  If such a claim is successful, the defendant has a right to rescind the contract.  *See Crawford Rehab. Servs., Inc. v. Weissman,* 938 P.2d 540, 547 n. 11 (Colo. 1997).

I find that Defendants' fraud in the inducement counterclaim does not require denial of summary judgment on the Note.  First, while the parol evidence rule does not generally apply to claims of fraud or fraud in the inducement, courts have held the rule does apply to such a claim "if the evidence in question is offered to show a promise which contradicts an integrated written agreement."  *Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 613 (6th Cir. 2001); *see also Wall v. CSX Transp., Inc.*, 471 F.3d 410, 420 (2d Cir. 2006); *Brinderson-Newburg Joint Venture v. Pacific Erectors, Inc.*, 971 F.2d 272, 281 (9th Cir. 1992). .

Indeed, this principle was recognized by the Colorado Court of Appeals in *Stevens v. Vail Assocs., Inc.*, 472 P.2d 729 (Colo. App. 1970).  It stated, "'[t]he rule is generally recognized that where the execution of a written contract has been induced by a contemporaneous parole ... promise not relating directly to the subject matter of the contract and such promise is not inconsistent with the provisions of the written contract, it will not be considered as merged therein and evidence of such parole ... promise is admissible."  *Id.* (quotation omitted).  The reason for this rule is that fraud in the inducement applies in the case of "a fraudulent misstatement of *fact* that induces a party to enter a contract, not a fraudulent promise of future performance that is within the

scope of the subject matter of the written contract but was not included in it." *Iams Co.*, 254 F.3d at 613 (emphasis in original).

In the case at hand, the alleged promise by the Trust that Defendants are alleged to have relied on expressly contradicts the express terms of the Note.  While Defendants allege that the Trust represented to IPC that the maturity date on the Note would be extended until development occurred or a value creation event took place at the Property prior to execution of the Note, the Note specifically states to the contrary. It states in that regard that "[t]he entire amount, with interest, and any charges due pursuant to the [DOT], are due in twenty-four (24) months ("Due Date"). . . .If not sooner paid, the entire principal amount outstanding and accrued interest thereon shall be due and payable on May 14, 2010." (*Id.*)  Thus, under the above authority, the evidence the Defendants rely on to support their fraud in the inducement claim is not admissible under the parole evidence rule.

Second, even if the evidence were admissible, Defendants have not established a viable claim for fraud in the inducement.  A fraud in the inducement claim "cannot be predicated upon the mere nonperformance of a promise or contractual obligation or upon the failure to fulfill an agreement to do something at a future time".  *H & H Distrib., Inc. v. BBC Int'l, Inc.*, 812 P.2d 659, 662 (Colo. App. 1990)   At most, in this case Defendants assert that the Trust made a mere promise that was not performed. Defendants have not proffered any evidence to show that at the time the Note was executed, the Trust knew its alleged representation was false.  Defendants have also not presented any evidence that at the time the Note was executed, the Trust did not

intend to fulfill that promise.  *See id.*  Finally, given the fact that Defendants signed the Note which was expressly contrary to the alleged promise in that it contained a maturity date of 2010, Defendants cannot show they justifiably relied on any such promise by the Trust or that its reliance was reasonable.  *See White Holding Co., LLC v. Martin Marietta Materials, Inc.*, 423 F. App'x 943, 945 (11th Cir. 2011) ("Despite its efforts, White Construction eventually agreed to the option to purchase clause while aware the terms of the MSA directly contradicted the alleged oral promises.  Thus, we are unable to conclude White Construction justifiably relied on any alleged promise . . . ."); *Coutts Bank (Switzerland) Ltd. v. Anatian*, 691 N.Y.S.2d 409, 410 (N.Y. App. Div. 1999) (alleged oral representations by bank that were significantly contradicted by the subsequent letters "rendered any reliance by defendants on the alleged oral representations . . . unreasonable as a matter of law, and such alleged oral representations cannot support the asserted defense[] of fraud in the inducement. . .).

Finally, Defendants argue that, regardless of any default, summary judgment on the Note is not appropriate because there are disputed issues of material fact as to the amount due with regard to the calculation of interest.  While the Trust argues that the Note provides that interest at 6% is compounded annually, Defendants argues that this is unclear.  The Note states that it is subject to both simple interest and interest compounded annually, and Defendants argue that the two concepts are mutually exclusive.  Accordingly, Defendants contend that the amount of interest due cannot be determined on the face of the instrument.  Defendants also reference O'Byrne's belief that the Note was subject to simple interest.

Again, I reject Defendants' argument.  Contract interpretation is a question of law for the court.  *B & B Livery, Inc. v. Riehl*, 960 P.2d 134, 136 (Colo. 1998).  Under Colorado law, written contracts that are complete and free from ambiguity shall be held to express the intention of the parties, and should be enforced according to their plain language.  *May v. United States*, 756 P.2d 362, 369 (Colo. 1988).  The fact that the parties have different opinions about the interpretation of the contract does not itself create an ambiguity.  *Id.*

In the case at hand, Colorado law is clear regarding the definition of interest that is to be compounded annually.  *See Francis ex rel. Goodridge v. Dahl*, 107 P.3d 1171, 1175 (Colo. App. 2005).  "Compound interest is defined as 'interest paid on both the principal and the previously accumulated interest.'"  *Id.* (quoting *Black's Law Dictionary* 830 (8th rev. ed. 2004)).  "Annual" or "annually" means 'occurring, appearing, made, done, or acted upon every year."  *Id.* (quoting *Websters Third New Int'l Dictionary* 88 (1986)).  The fact that the Note references simple and compound interest does not make the Note ambiguous.  *See Francis*, 107 P.3d at 1175 ("we conclude the total prejudgment interest in this case is arrived at by first calculating simple interest on the amount of the judgment from the date plaintiff's action accrued (here, the date of the accident) until the day before the action was filed. That simple interest amount should then be added to the amount of the judgment and used as the initial base amount to calculate compound interest annually from the date the suit was filed until the date judgment is entered").  Since I find that the Note is not ambiguous on this issue, any belief by O'Byrne about the meaning of the Note regarding interest is inadmissible.

Based upon the foregoing, the Trust's summary judgment is granted as to Claim

One of the Amended Complaint, asserting that IPC is in default of its obligations under

the Note.  Accordingly, summary judgment is granted in the Trust's favor and against

IPC in the amount of all sums due under the Note, including the full principal sum,

interest, and default interest accrued since the date the Note was due, plus attorney

fees and related collection costs.

### 2.   Whether Reformation is Appropriate

The Trust asserts in its motion that the Court should reform the DOT to conform

to the actual agreement of the parties, which required that the DOT be executed by the

owner of the Property, WPDC.  It argues that reformation is appropriate in order to

accomplish the parties' intent that the DOT secure the obligations of IPC under the

Note.  It also argues that reformation should relate back to the time the instrument was

originally executed in May 2008.  Defendants assert that summary judgment should be

denied on this claim.  I grant in part and deny in part the Trust's motion as to the

reformation claim.

Defendants first argue that the Court should deny the Motion because the DOT is

a spurious document that is patently invalid pursuant to Colo. Rev. Stat. § 38-35-201(3).

That statute defines a spurious document to include: "any document that is forged or

groundless, contains a material misstatement or false claim, or is otherwise patently

invalid."  *Id.*  As applied to interests in real property, the Colorado courts have held that

a deed is a spurious document as defined in the statute if an instrument purporting to

affect an interest in property is conveyed by a party with no record interest in the

property. *GMAC Mortg. Corp.* v. *PWI Group,* 155 P.3d 556, 558 (Colo. App. 2006). That is because under Colorado law, only the record owner of real property may convey or encumber the same. *Id.*

Here, while I agree with Defendants that the DOT may be a spurious document under the above authority, this does not mean that reformation is inappropriate if the parties, including WPDC as owner of the Property, clearly and unequivocally intended that the DOT be issued to the Trust. Under Colorado law, "[r]eformation is an appropriate remedy when the evidence clearly and unequivocally shows that an instrument does not express the true intent or agreement of the parties." *Boyles Bros. Drilling Co. v. Orion Indus., Ltd.*, 761 P.2d 278, 281 (Colo. 1988); *see also Alexander Dawson, Inc. v. Sage Creek Canyon Co.,* 546 P.2d 969, 971 (Colo. App. 1976) (deed of trust reformed because the executing party erroneously included one parcel in the description while omitting another). If the parties have "made a mutual mistake or [if] there has been a mistake by one of the parties and fraud or inequitable conduct on the part of the other," then reformation is appropriate. *Boyles*, 761 P.2d at 281.

Reformation is an equitable remedy—it "should be available when fairness demands such relief." 66 Am. Jur. 2d. *Reformation of Instruments* § 11 (2011); *accord Tayyara v. Stetson*, 492 P.2d 73, 74 (Colo. App. 1971). The burden of proof is on the party seeking reformation and the proof must be "clear, unequivocal and indubitable." *Segelke v. Kilmer*, 360 P.2d 423, 426 (Colo. 1961). "The general rule is that, except as to innocent parties who acquire rights without notice, reformation of an instrument relates back to and takes effect from the time of original execution of the instrument."

*Diocese of Bismarck Trust v. Ramada, Inc.*, 553 N.W.2d 760, 770 (N.D. 1996); *accord Board of Comm'rs of Pitkin County v. Timroth*, 87 P.3d 102, 109 (2004).

Thus, I turn to whether reformation is appropriate as a matter of law under the above legal framework.  The Trust argues that it is clear—in fact, essentially admitted—that the DOT was executed by IPC, the maker of the Note, rather than WPDC, to which the Property had been transferred shortly before the DOT was executed, and that such execution was contrary to the parties' agreement and clear intent.  It also argues that the fact assurances were made that this error would be corrected removes any possible doubt regarding the parties' actual agreement and intent.

I agree with the Trust that the evidence shows that the parties clearly and unequivocally intended that the DOT be executed by the owner of the Property, WPDC, in order to accomplish the parties' intent that it secure the obligations of IPC under the Note.  While Defendants deny the Trust's assertion that the execution of the DOT by IPC was not in accordance with the parties' agreement that there be an effective transfer of property via the DOT's execution, they have presented no evidence that supports this.  Instead, the Trust has presented evidence that supports its argument. For example, O'Byrne's counsel stated on February 22, 2011, that "if there is an error in the deed of trust that does not give the Trust the intended security for the promissory note, my client will correct the error."  (Perka Decl. Ex. 3.)  No one has disputed the fact that the Property was the "intended security."  Further, counsel for Defendants proposed a Correction Addendum to the DOT which would clarify that "the lien of the Deed of

-30-

Trust is a valid trust deed lien against the Property", correct the Borrower under the

Deed of Trust "to be WPDC", and which stated that it "cures the mistaken execution of

the Deed of Trust by IPC, as Borrower, for the reason that at the time of such execution

of the Deed of Trust WPDC, not IPC, was the record owner of fee simple title to the

Property." (Perka Decl. Ex. 7.)  The Correction Addendum also expressly stated that

WPDC ratified the DOT.  (*Id.*)  Accordingly, I grant summary judgment as to this portion

of the reformation claim, which is the Third Cause of Action in the Amended Complaint.

The Trust also argues, however, that reformation should relate back to the time

the instrument was originally executed in May 2008,and asks that the Court exercise its

equitable powers by entering an order on summary judgment requiring Defendants to

reform the DOT so that it is in substantially the same form of the proposed reformation

documents sent to O'Byrne's counsel on June 10, 2011, making the DOT effective as of

May 6, 2008.  I deny the motion on this issue.  I find that there are genuine issues of

material fact as to the parties' intention regarding what date the DOT would be effective.

While Plaintiff requests the Court reform the DOT to be effective as of May 6, 2008,

Defendants have presented evidence through O'Byrne's Declaration that their intent

was not to grant the Trust an interest in the Property as of that date.  Further, the DOT

was not actually executed until June 5, 2008, and the Trust has presented no authority

that the Court has the power to reform a DOT prior to the point when it was even

executed, particularly when the parties' intent about this is disputed.  Finally,

reformation of the DOT to be effective as of May 6, 2008, may well impact First

Western's lien priority.

IV.   <u>CONCLUSION</u>

Based upon the foregoing, it is

ORDERED that The Thomas Trust's Motion for Summary Judgment Reforming Deed of Trust and Ordering Payment of Promissory Note filed January 11, 2012 (ECF No. 12) is **GRANTED IN PART AND DENIED IN PART.**   Specifically, it is granted as to the First Cause of Action in the Amended Complaint alleging that Defendant IPC is in default under the Note.   It is granted in part and denied in part as to the Third Cause of Action, the reformation claim.   It is

FURTHER ORDERED that Plaintiff's Motion to Refer Pending Dispositive Motions to United States Magistrate Judge Kristen L. Mix for Report and Recommendation filed April 4, 2012 (ECF No. 43) is **DENIED**.

Dated:  September 25, 2012

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge